# N. Y. SUPERIOR COURT.

ELIZABETH R. COFFEY, respondent, agt. THE HOME LIFE INSURANCE COMPANY, appellants.

There is no presumption of law that a person who commits *suicide was insane*, or that the fact of suicide is *prima facie* evidence of insanity (FREEDMAN, J. *dissenting. See his opinion*).

Aside from extrinsic facts and circumstances, the law presumes that every person who destroys his own life, is sane up to the very moment when he does the act which causes his death. It cannot therefore be properly said that the commission of that act, not only removes the presumption of sanity, but establishes a legal presumption that he was then insane (*Per* BARBOUR, *Ch. J*).

*General Term.*
*Before* BARBOUR, *C. J.,* FREEDMAN *and* SEDGWICK, *JJ.*
*Decided February 1st, 1873.*

GEORGE W. PARSONS, *for appellant.*
WHEELER H. PECKHAM, *for respondent.*

BARBOUR, *C. J.*—This was an action upon a life insurance policy which contained this condition: "In case he" (the person whose life was covered) "shall die by his own hand, * * * then the said company shall not be liable for the payment of the sum insured or any part thereof." Upon the trial, evidence was given tending to prove the following facts:

Just previous to the taking of the policy, Coffey, the person whose life was insured for the benefit of his wife, the plaintiff was insolvent and out of business, and had a wife and several children dependent upon them for their support.

While thus situated he procured insurance upon his life to the amount of some $40,000, mostly in favor of his wife, borrowing the money from his friends to pay the premiums thereon upon the false statement that he wanted the same for his expenses in carrying into effect some pretended land sales. A short time after he effected these insurances Coffey took his passage on a steamboat from Louisville to Cincinnati, where during the trip he went into his stateroom, and although the weather was quite warm, locked and fastened the door and windows. After the arrival of the boat at Cincinnati, the next morning, the door of the stateroom was broken open, when he was found in a comatose state, and the next night he died from the effects, as then appeared on examination, of an overdose of morphine. Other evidence was also given of circumstances which tended to prove that his death was caused by his own voluntary act in a sane state of mind, and in pursuance of a preconceived plan.

The judge before whom the cause was tried charged the jury *enter alia* thus: "When a man takes the life of another and alleges insanity as an excuse and defense, he is met by the presumption of law, that he was sane, and he must remove or rebut such presumption by showing affirmatively and by competent and sufficient proof that he was insane when he committed the deed. But when a man takes his own life, the presumption of law is otherwise. The law does not and cannot presume that a man in the full possession of his mental faculties, in that normal condition of mind which we call sanity, will deliberately take his own life, and therefore, so far as there is any presumption, it favors insanity at the time of committing an act of self-destruction. I therefore charge you as matter of law, that as affecting this case you must presume, that the deceased, when he took his life, was not in a sound state of mind, it is, however, but a mere presumption, and may be removed by evidence. But as I have said before, the burden of removing it lies upon

the defendants, and it is for you to say whether they have done so."

The question raised by the exceptions to this portion of the charge of the learned judge, is somewhat novel and important. It has long been a well settled rule in the law of evidence, that where the deed or act of a party is sought to be avoided on the ground of his insanity, he will be presumed to be of sound mind until the contrary shall appear, and, therefore, that the burden of proving such party to have been insane rests upon him who alleges it. Indeed the rule that sanity is to be presumed until the contrary be proven, is a general one, applicable to all cases, and its reason is obvious.

It is founded upon the fact that general sanity is the natural and ordinary condition of the human mind, and that mankind, considered as a class or whole, are sane, (the exceptions being comparatively few and rare,) followed by the natural conclusion that each individual may well be assumed to be like the great mass of his fellow men in that regard, unless proved to be otherwise (1 *Greenl. Ev.*, § 42 ; 2 *ib.*, §§ 689, 873 ; 3 *ib.*, § 5 ; 2 *Kent's Com.*, § 451 ; *Bliss on Life Ins.*, § 378 ; *McNoghtin's Case*, 10 *Clark & Fin.*, 210 ; *Gardner* agt. *Gardner*, 23 *Wend.*, 526).

Aside from extrinsic facts and circumstances, therefore, the law presumes that every person who destroys his own life, is sane up to the very moment when he does the act which causes his death. Can it properly be said, then, that the commission of that act not only removes the presumption of sanity, but establishes a legal presumption that he was then insane ?

No presumption that insanity exists in the case supposed, can be deduced from the mere fact that the death of the person was caused by his own physical act ; for every legal presumption of a fact of that character must be founded and derived from some other fact or facts, with which it is usually

or always formed, as the result of general experience and knowledge, to be connected in a certain relation (1 *Greenl. Ev.*, § 33).

There can be no doubt, however, that if courts were at liberty to assume as a fact established by experience, that all persons who intentionally deprive themselves of life are insane or diseased in mind, or even such a majority of them that it might properly be said that persons who thus destroy their lives are, as a general rule, insane, and that sanity is a mere exception, the legal conclusion that insanity or derangement of mind must be presumed in every case in which it appeared that the man intentionally caused his own death, would necessarily follow. But that fact is not so established. Not only is the history of the world in former times filled with instances in which great and sound minded men, such as Cato and Hannibal, have committed suicide, and where others have for the purpose of saving their estates from forfeiture submitted themselves to *peine forte et dure*, but the most learned men of the present day in this branch of mental science, not mere lawyers, are still groping for the truth in the twilight of doubt and peradventure. Indeed it is by no means settled, either among educated men or in the common mind, that even a majority of those who deprive themselves of life by their own physical act to do so because of insanity. The fact cannot be legally presumed, therefore, that a person who has killed himself was not sane at the time, and consequently the charge in question was erroneous.

The most that can be said is that, inasmuch as many, and perhaps, most persons who destroy their own lives are insane at the time, the fact of such self-destruction, of itself, wholly removes the presumption of sanity (*See Cooper* agt. *Mass., &c., Ins. Company*, 102 *Mass.*, 227 ; *Terry* agt. *Mutual Life Ins. Company*, 1 *Dillon*, 403).

Judgment reversed with costs and new trial directed.

SEDGWICK, *J.*, (concurring). I am obliged reluctantly to differ with the learned judge in charging the jury, that the law presumed that a man was insane who killed himself.

*First.*—I do not think the law has made any presumption on that specific subject. The only presumption it has made, on the general subject, is that every man is sane, until the contrary is shown.

*Second.*—A judge, as such, cannot determine, nor has he the means to determine, whether an individual case of suicide is the result of insanity, especially when the cause of the insanity is to be confined to suicide. Therefore he cannot make a presumption on the subject, which is a generalization more or less perfect from individual cases.

I think the judgment should be reversed.

FREEDMAN, *J.*, (dissenting). This is an action upon a policy of insurance for five thousand dollars made by the defendant upon the life of Benjamin S. Coffee in favor of the latter's wife, the plaintiff in the action. The policy, among other provisions to avoid it, contained a clause that, in case the assured should die by his own hand, the company should not be liable for the payment of the sum insured or any part thereof. In *Breasted* agt. *The Farmer's Loan and Trust Co.*, (4 *Seld.*, 299), the policy contained precisely the same clause, and the court of appeals, in sustaining the decision of the supreme court in the same case (4 *Hill*, 73), and disapproving the English doctrine of *Borrodale* agt. *Hunter* (5 *Man. & Gr.*, 648), and *Clift* agt. *Schwabe* (3 *Man. & Gr.*, 437), settled the law of this state to be, that the phrases " death by his own hand " and " death by suicide " mean the same thing, and that both, unless qualified by some other expressions, import a criminal act of self-destruction, which can be committed only by the free will of a sane man.

The learned judge, who presided at the trial, was correct, therefore, in charging that, if Coffee, at the time he took the

poison, was insane, if he was then laboring under either
permanent or temporary insanity, he did not die by his own
hand within the true meaning of that phrase, and that con-
sequently there was no breach of the condition of the policy
in that respect.   Indeed no error whatever seems to have
been committed in giving and refusing instructions to the
jury, provided the learned judge was justified in refusing to
charge, that the presumption of sanity attaches to the com-
mission of suicide, and in charging, in place thereof, as fol-
lows :

" The law does not and cannot presume that a man in the
full possession of his mental faculties, in that normal con-
dition of mind which we call sanity, will deliberately take
his own life, and therefore, so far as there is any presump-
tion, it favors insanity at the time of committing an act of
self-destruction.

" I therefore charge you as matter of law that there is no
such presumption, and that as affecting this case you must
presume that the deceased when he took his life was not in
a sound state of mind.

" It is, however, but a mere presumption, and may be re-
moved by evidence.   But as I have said before, the burthen
of removing it lies upon the defendants, and it is for you to
say whether they have done so.

" The defendants to strengthen their position that the as-
sured died by his own deliberate and criminal act, have given
some evidence which they claim shows a motive, and, as they
say, a sufficient motive for the criminal act.   They have
shown that the assured was in a pecuniarily embarrased con-
dition ; was in debt, and prosecuted and harassed by his
creditors.   They have also shown that at or about the time
he effected the insurance in this case he procured other poli-
cies upon his life in other companies, all for the benefit of
his wife, and amounting in the aggregate to forty thousand
dollars. and they have further proved the substance of a con-

versation between the deceased and a lawyer of Cincinnati, in which he sought information and advice respecting the legal effect of the condition against self-destruction in the policy.

"These facts and circumstances are submitted to you as tending to show, as is claimed, a motive, and thereby to repel the presumption of insanity, and it is for you to say whether you believe they are sufficient."

The question thus presented is an important, novel and difficult one. It is an open one in this state, and as the few adjudications made elsewhere upon it (*Nimick* agt. *The Mutual Life Ins. Co.*, 10 *Am. Law Reg.*, *N. S.*; 101; *Terry* agt. *The Mutual Life Ins. Co.*, 1 *Dillon*, 403; *St. Louis Mutual Life Ins. Co.* agt. *Graves, reported in* 6 *W. P. D. Bush*, 268; and also in *N. Y. Daily Transcript of March 7th*, 1871, in which last named case the Kentucky court of appeals stood equally divided) are conflicting, it must be decided on principle. Fortunately in this case, its consideration is not embarrased by other questions, which are usually connected with it and which relate to the different forms or species of insanity known to the law. For the charge has not been excepted to in that respect, nor has the definition of insanity, which was laid down for the guidance of the jury, been complained of in any manner. So, by omitting to move for the direction of a verdict, the defendant has conceded the sufficiency of plaintiff's evidence to carry the case at least to the jury.

Freed, therefore, from all embarrassments which the intervention of other questions might occasion, I think the examination of the point at issue may be commenced in the most fitting manner by considering for a moment what *life* is. The definitions of it given by philosophers and biologists are almost innumerable. But none of them commends itself so much to my mind as that given by Professor Herbert Spencer, who deservedly ranks in scientific circles as one of

the greatest of modern thinkers. It is, that life consists in the definite combination of heterogeneous changes, both simultaneous and successive, in correspondence with external co-existences and sequences, or, in other words, in the continuous adjustment of internal relations to external relations. Consequently life is a continuous struggle. All vital actions, considered not separately, but in their ensemble, have for their final purpose the balancing of certain outer processes by certain inner processes. There are unceasing external forces tending to bring the matter of which organic bodies consist, into that state of stable equilibrium displayed by inorganic·bodies; there are internal forces by which this tendency is constantly antagonized; and the perpetual changes which constitute life, may be regarded as incidental to the maintenance of the antagonism. So strong is this antagonism in the human organism that, while there is life, there is hope. The strength, in the natural sane man, of the love of life is indeed proverbial. Drowning men will catch.at straws. All that a man has, will be given in exchange for his life.

From individual organisms thus struggling for life small aggregations were found, which soon felt the want of alliance and union with each other. This led to the formation of civil society, and the formation of that necessarily led to the establishment of government for the express purpose of preserving and keeping that society in order. Thus it came that every member of the society had to submit to a restraint by human laws of his natural liberty, to do as he pleased in his struggle for life and existence, and that judges, juries and all the instruments of the law came into being. Whenever it was found necessary or expedient, on account of new manifestations of the tendency on the part of the strong to subjugate the weak, in spite of existing law, to extend and perfect the prevailing system of law, it was done. In the course of the general improvement, which our sys-

tem has thus undergone, the doctrine of presumptive evidence became engrafted upon it. The presumptions recognized by the law were founded, either upon the first principle of justice, or the laws of nature, or the experienced course of human conduct and affairs, and the connection usually found to exist between certain things. Under these circumstances it was found indispensably necessary for the proper enforcement of the whole body of the law, and essential to the safety of society, to establish the rule that, because sanity is the normal condition of the intellect, every man should be presumed to be sane, and that under the effect of such presumption, he, who seeks to avoid responsibility for an act on the plea that he was insane, and hence not responsible, should take upon himself the burden of proving that condition of his mind. The rule was accordingly established, and upon it has since been built the further one, that every sane person must be presumed to intend that, which is the ordinary and natural consequence of his own purposed act. Both these presumptions have ever since been firmly maintained and rigidly enforced. They are applied, and justly so, to the murderer, the homicide, the parricide, and the living criminal of every grade; for the experience of mankind has demonstrated that even the most atrocious crime is generally perpetrated in the course of the struggle for life and existence with the deliberate purpose of effecting by its commission an adjustment of internal relations to external relations. The presumption of sanity attaches, therefore, to a man in all his dealings with his fellow-men.

But in case of suicide the reason for the rule fails, and the necessity for its application disappears. Suicide is self-destruction. It is a self-inflicted violent and summary severance of relations, contrary to the ordinary laws of nature. It is a refusal to obey nature's law, and therefore, in the light of the present state of science, such an unnatural proceed-

ing, that eminent men of great learning and research insist, that suicide is necessarily an insane act, while others contend that it is only *prima facie* evidence of insanity. The first proposition has never been accepted to any great extent; but the second is quite prevalent among scientific men and is daily gaining ground (*Winslow's Anatomy of Suicide,* ch. 11, 237; 1 *Esquirol's Maladies Mentales,* 559, 560; *Ellis on Insanity, Lond. Ed.,* 1838, 114, 115; *Prichard, Lond. Ed.,* 1842, 134, 141; *Bernard & Tuke on Insanity, Phila. Ed.,* 1858; 88, 153, 202, 204, 331; *Dean's Medical Jurispr.,* 508, 509).

As the law should always keep step with the great truths, that are unearthed from time to time by science, the courts, upon these authorities, might well hold, and in my judgment should hold, in a case like the present that, while upon the whole case the burden of proof is upon the plaintiff to satisfy the jury that a loss has occurred under the policy, that is to say, that the person, whose life is covered by the policy, was insane at the time of the perpetration of the deed within the true definition of that term in the law, the presumption to be drawn from the naked and unexplained fact of suicide is, that the perpetrator at the time of the fatal act, was not in the possession of a sane and well-poised mind. Such presumption, like other presumptions of a similar character, is by no means conclusive, but may be removed by evidence.

It becomes neutralized and inoperative as soon as a motive for the commission of the act is shown by evidence. Upon this latter point the charge of the learned judge below is wholly unexceptionable.

As long as the presumption of insanity is thus applied and enforced, harmony will prevail between science and law, and no evil results can accrue to society. For the danger to be dreaded does not lie in the presumption, which, as such, may be rebutted and overcome by proof in each case, but in the

doctrine of moral and emotional insanity and of temporary insane impulses, or, to be still more specific, in the vague and unsatisfactory definition sometimes laid down by the courts for these species of insanity and that class of impulses.

The fact which is generally alluded to, to sustain the opposite doctrine, that men of historic fame, such as Themistocles, Demosthenes, Hannibal and Cato committed suicide, without the imputation or suspicion of impelling insanity, cannot have much weight at this late day. Insanity, as now understood, was not known then, nor were the unerring and immutable laws of nature then known and understood to the same perfection as they are now. So it may also be safely assumed that each of these men shared the mythological notions of his age. The ancients seem very generally to have arrogated to themselves the right to destroy their own lives, whenever, in their judgment, it should be proper. Pliny was accustomed to term it the greatest privilege the gods had left in the power of men amid the calamities of human life. Justice ROBERTSON, of the Kentucky court of appeals very properly remarked of the historic men above referred to. " Without faith in a future state of retribution, they seemed, each and all, to prefer, on rational calculation, annihilation to hopeless torture or degradation." With the Christian era, however, came a change of views and of feeling in that respect, and Christian rulers set to work to suppress the barbarous practice. Thus it came that under the common law, suicide was declared to be a crime, and visited with punishment as such. As the criminal could not be reached himself, for the reason that, by the very act of suicide, he had placed himself beyond the reach of human punishment, the penalty consisted in denying the body of the criminal Christian burial and in the forfeiture of his goods to the king.

Nor can I appreciate the force of the reasoning of the learned chief justice in this case, in first denying that in-

sanity can be presumed, and then holding that the most that can be said, is, that, inasmuch as many, and perhaps most, persons who destroy their own lives are insane at the time, the fact of such self-destruction, of itself, wholly removes the presumption of sanity. If suicide is the unnatural proceeding I have shown it to be, and the fact of self-destruction wholly removes the presumption of sanity, because many, and perhaps most, persons who destroy their lives are insane at the time, I can see no escape from the conclusion that the naked and unexplained fact of suicide must be *prima facie* evidence of the existence of insanity at the time of the perpetration of the act.

I have also carefully examined the recent case of *Fowler* agt. *The Mutual Life Ins. Co.*, (4 *Lans.*, 202), but do not consider it in point here. It seems to have been determined on the strength of the declarations made by the assured shortly before his death and which, in the judgment of the court, conclusively established the fact, that his subsequent suicide was entirely voluntary, deliberate, willful and with knowledge of its nature, character and consequences.

Being unable to discover any error in the instructions given and refused on the trial, and defendant's exceptions to the admission and exclusion of testimony by the court having been found, on examination, to be untenable, I am of the opinion that the judgment and order appealed from should be affirmed with costs.